# Notice of Removal
# Attachment No. 1


# Complaint filed in
# King County Superior Court
# Case No. 19-2-25768-7 SEA

1
2
3
4
5
6
7

**SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR KING COUNTY**

8
9

CITY OF SEATTLE, a municipal corporation,

                           Plaintiff,

10

        v.

11
12

MCKESSON CORPORATION, CARDINAL
HEALTH, INC., AMERISOURCEBERGEN
DRUG CORPORATION, and WALGREENS
BOOTS ALLIANCE, INC. a/k/a
WALGREEN CO.,

13
14
15

                      Defendants.

16

No.

COMPLAINT

17
18
19
20
21
22
23
24
25
26
27
28

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................1

II.  PARTIES ......................................................................................3

    A.  Plaintiff. ...............................................................................3

    B.  Defendants. ...........................................................................3

III.  JURISDICTION AND VENUE ................................................................4

IV.  FACTUAL ALLEGATIONS ...................................................................4

    A.  Defendants have a duty to implement effective safeguards to prevent diversion and report suspicious orders of prescription opioids. ............................................................................4

    B.  Defendants are aware of their duty to implement effective safeguards to prevent diversion and report suspicious orders. ...............6

    C.  Defendants failed to implement effective safeguards to prevent diversion and pumped millions of opioids into Seattle without halting or reporting suspicious orders. ..............................................9

        1.  McKesson ..........................................................10

        2.  Cardinal .............................................................13

        3.  AmerisourceBergen ...............................................15

        4.  Walgreens ..........................................................17

    D.  Defendants coordinated and concealed their ineffective anti-diversion practices. ..................................................................22

    E.  Defendants' conduct foreseeably led to an opioid epidemic that has wrought havoc on Seattle communities. ....................................24

    F.  Defendants' conduct has severely impacted Seattle and has caused the City substantial economic injury .............................................31

        1.  Public Health Services ...........................................31

        2.  Paramedic Services ...............................................33

        3.  Policing Services and Criminal Justice Costs ..................33

        4.  Combatting Homelessness ......................................35

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

V.      CAUSES OF ACTION ...................................................................................36

FIRST CAUSE OF ACTION  WASHINGTON CONSUMER PROTECTION
        ACT ("WCPA") RCW CHAPTER 19.86 .............................................36

SECOND CAUSE OF ACTION  PUBLIC NUISANCE RCW CHAPTER 7.48 ........................38

THIRD CAUSE OF ACTION  PUBLIC NUISANCE WASHINGTON
        COMMON LAW .................................................................................40

FOURTH CAUSE OF ACTION  NEGLIGENCE ..................................................................41

FIFTH CAUSE OF ACTION  CIVIL CONSPIRACY ...........................................................42

PRAYER FOR RELIEF ..................................................................................................43

JURY DEMAND .............................................................................................................44

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

## I.      INTRODUCTION

1.      The nationwide opioid epidemic has grown into a public health crisis of historic proportions. It is the deadliest drug epidemic this country has ever faced. In 2017 alone, opioid overdoses killed 47,600 Americans, and widespread opioid abuse is devastating communities across the nation.

2.      On average, two Washingtonians die every day from an opioid overdose. In the last ten years, opioid overdoses have been responsible for the deaths of more than 8,000 people statewide. In 2018, 275 people suffered fatal overdoses right here in King County.

3.      These deaths are attributable to a flood of prescription opioids into the region over the last two decades. Between 2006 and 2012 alone, more than 1.8 billion opioid pills were distributed in Washington, and nearly a quarter of these opioids were directed into King County.

4.      As this crisis has evolved, local and state governments have pursued a range of remedial initiatives. In 2016, King County and the Mayors of Seattle, Auburn, and Renton convened the Heroin and Prescription Opiate Addiction Task Force, bringing together experts from across multiple disciplines to develop a comprehensive strategy to confront the region's growing opioid epidemic. After recommending a range of actions, the Task Force continues to meet to implement critical initiatives, including expanded access to treatment options and programs promoting the safe disposal of unused prescription opioids. Seattle has also funded a range of public health programs addressing opioid abuse, including community treatment facilities and outreach programs in homeless encampments, while also expending substantial sums outfitting local law enforcement officers and paramedics with naloxone, a drug designed to reverse opioid overdoses.

5.      Seattle has devoted a substantial portion of its taxpayer-funded financial resources toward combatting opioid abuse. The City's efforts have saved countless lives and have provided a second chance to many individuals suffering opioid addiction. But there is more work to be done and additional resources and even more comprehensive efforts are needed to stem the tide of opioid abuse, addiction, and overdose deaths.

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

6.      While this burden has fallen on Seattle, it was born from the misconduct of others who must be held accountable. In 2017, Seattle initiated a civil action against certain opioid manufacturers who deceptively marketed their drugs in Seattle, a marketing campaign that led to runaway demand for prescription and other opioids. Seattle now brings this action against certain opioid distributors who fed that runaway demand—namely, McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Drug Corporation, and Walgreens Boots Alliance, Inc. (together, "Defendants"). Recently released data show that, collectively, Defendants shipped more than 350 million prescription opioids into King County between 2006 and 2012, and they did so without implementing any meaningful controls to ensure that these dangerous narcotics were not being diverted into illicit distribution channels.

7.      Such anti-diversion controls are required by law. Because of the dangers posed by opioids, even when used legally for medical purposes, the distribution of these drugs is carefully regulated under the federal Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, and Washington State's Uniform Controlled Substances Act, RCW 69.50 *et seq*.

8.      These laws oblige distributors to prevent the diversion of opioids from legitimate, medical uses into illegitimate uses. Among other things, federal and state law require distributors to effectively control their supply chains to prevent diversion, and to identify, report, and suspend suspicious orders of opioids—for example, orders that deviate from historic baselines, or orders placed by rogue providers and dispensaries. More fundamentally, distributors have obligations under the common law to exercise reasonable care in the conduct of their business and to not create a public nuisance by unreasonably interfering with public health and safety through the distribution of dangerous, addictive drugs.

9.      The Defendants in this case failed to discharge these critical obligations. Rather than report suspicious opioid shipments into the Seattle region, as required, Defendants essentially did nothing. Defendants' inaction preserved a valuable revenue stream, as drug distributors ultimately profit from the diversion of their products into the black market. But Defendants' inaction also fueled the opioid epidemic gripping the region.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

10.     Beyond the tragic human devastation, Defendants' conduct has exacted a foreseeable financial burden on Seattle, which has spent many millions of dollars combatting the opioid crisis. Eradicating opioid abuse and its consequences will require an enormous further outlay of public health and law enforcement resources at the City level. These abatement costs are directly attributable to Defendants' conduct and the flood of opioids it unleashed on the region.

11.     With this action, Seattle seeks to hold Defendants responsible, individually and collectively, for creating a public nuisance in violation of RCW Chapter 7.48 and the common law, engaging in unfair and deceptive acts in violation of the Washington Consumer Protection Act, negligently failing to maintain controls against diversion, and participating in a civil conspiracy. Seattle seeks all remedies available, including injunctive relief, damages, and abatement.

## II.     PARTIES

**A.     Plaintiff.**

12.     Plaintiff City of Seattle ("Seattle" or "City") is a municipal corporation of the first class, organized and existing under the laws of the State of Washington, that conducts business in King County, Washington.

**B.     Defendants.**

13.     Defendant McKesson Corporation ("McKesson") is a corporation organized under the laws of the State of Delaware with its principal place of business in San Francisco, California. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in Seattle.

14.     Defendant Cardinal Health, Inc. ("Cardinal") is a corporation organized under the laws of the State of Ohio with its principal place of business in Dublin, Ohio. During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in Seattle.

15.     Defendant AmerisourceBergen Corporation ("AmerisourceBergen") is a corporation organized under the laws of the State of Delaware with its principal place of business

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

in Chesterbrook, Pennsylvania. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in Seattle.

16.     Defendant Walgreens Boots Alliance, Inc. a/k/a Walgreen Co. ("Walgreens") is a corporation organized under the laws of the State of Delaware with its principal place of business in Illinois. Walgreens, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. During all relevant times, Walgreens distributed prescription opioids throughout the United States, including in Seattle. Walgreens also operates retail pharmacies to which it distributes and dispenses prescription opioids.

### III.     JURISDICTION AND VENUE

17.     King County Superior Court has subject matter jurisdiction over this action by grant of authority under the Constitution of the State of Washington.

18.     King County Superior Court has personal jurisdiction over Defendants under the long-arm statute of the State of Washington (RCW 4.28.185), and the Constitution of the United States, because they conduct business in Washington, purposefully direct or directed their actions toward Washington, and/or have the requisite minimum contacts with Washington necessary to permit the Court to exercise jurisdiction.

19.     Venue in King County Superior Court is proper pursuant to RCW 4.12.020 because the claims for relief asserted by Seattle arose in King County.

### IV.     FACTUAL ALLEGATIONS

**A.     Defendants have a duty to implement effective safeguards to prevent diversion and report suspicious orders of prescription opioids.**

20.     As with other pharmaceutical products, the manufacturers of prescription opioids do not provide their drugs directly to consumers. Rather, manufacturers ship their opioids to wholesale distributors, who supply the drugs to pharmacies and other retail dispensaries (e.g. hospitals and providers) from whom consumers can fill prescriptions. In this supply chain, the distributors are essential intermediaries through which prescription opioids pass. Certain pharmacy distributors—including Defendant Walgreens here—are also vertically integrated in that they distribute opioids to their own retail outlets.

- 4 -

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

21.     Most prescription opioids are classified as Schedule II controlled substances, meaning they have a "high potential for abuse" that "may lead to severe psychological or physical dependence."[1] As distributors of these dangerous drugs, each Defendant has an obligation to comply with the federal Controlled Substances Act ("CSA") to ensure that the drugs are not being diverted from their intended and legal channels. Because they operate in Washington, each Defendant must also register with both the Drug Enforcement Administration and the Washington State Department of Health.[2] Under both the CSA and Washington law, all DEA registrants must fulfill security, recordkeeping, monitoring and reporting requirements that are designed to identify and prevent diversion.[3] To that end, each Defendant must "design and operate a system" that monitors and reports suspicious orders to the DEA.[4] "Suspicious orders" include, but are not limited to, orders of "unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[5]

22.     Defendants are prohibited from filling suspicious orders, unless and until they determine, though an exercise of due diligence, that the order is not likely to be diverted into illegal channels.[6] Even then, any order that has been initially identified as suspicious must be reported to the DEA, regardless of whether it is ultimately cleared for shipment.

23.     Washington law similarly requires each distributor to maintain a complete and accurate record of each substance manufactured, sold, delivered, lost, stolen, or otherwise

---

[1] 21 U.S.C. § 812(b)(2).

[2] *See* 21 C.F.R. § 1301.11; RCW 69.50.302.

[3] The requirements of the CSA have been explicitly adopted and incorporated into Washington law. WAC 246-879-080; RCW 69.50.306; WAC 246-887-020 ("[T]he federal regulations are specifically made applicable to registrants in this state.").

[4] 21 C.F.R. § 1301.74(b); WAC 246-879-050(7).

[5] *Id.*

[6] *Id*.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

disposed of.[7] And any entity that is sanctioned by the DEA for failing to abide by the requirements of the CSA is subject to identical sanctions under state law.[8]

24.     Beyond these statutory requirements, Defendants also have a common law duty to exercise reasonable care under the circumstances not to create a public nuisance or a foreseeable risk of harm to others stemming from their distribution of dangerous and highly addictive drugs.

**B.     Defendants are aware of their duty to implement effective safeguards to prevent diversion and report suspicious orders.**

25.     The DEA has gone to great lengths to remind Defendants of their obligations to identify, report, and suspend suspicious shipments. These efforts have included online and in-person conferences—which Defendants have attended—as well written guidance.[9]

26.     For example, as early as 1984, the DEA advised pharmaceutical distributors that "the submission of a monthly printout of after-the-fact-sales will not relieve a registrant from the responsibility of reporting excessive or suspicious orders" and that "DEA has interpreted 'orders' to mean prior to shipment."[10]

27.     In 2006, the DEA sent a letter to every registrant to "reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."[11] The DEA was clear that such responsibilities include reporting and stopping "suspicious orders that might be diverted."[12]

28.     In 2007, another letter was sent to "every entity in the United States registered with the Drug Enforcement Administration (DEA) to manufacture or distribute controlled

---

[7] WAC 246-879-040; RCW 69.50.306; WAC 246-887-020.

[8] *See* RCW 69.50.303, 304 (providing for suspension or revocation of licenses for any distributors who, among other things, fail to maintain "effective controls against diversion of controlled substances into other than legitimate medical, scientific, research, or industrial channels").

[9] Distributor Conferences (2013-2016), available at: https://www.deadiversion.usdoj.gov/mtgs/distributor/index.html; National Conference on Pharmaceutical and Chemical Diversion (2008-2017) available at https://www.deadiversion.usdoj.gov/mtgs/drug_chemical/index.html; Diversion Awareness Conferences (2011-2017) available at: https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/index.html.

[10] *In Re: National Prescription Opiate Litigation,* 17-md-2804 (N.D. Ohio), Dkt. No. 1957-5.

[11] *Id.* at Dkt. No. 1957-6.

[12] *Id.*

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

substances."[13] This letter "reiterate[d]" that distributors have an obligation to report suspicious orders and provided a framework for identifying such orders.[14] In particular, the DEA advised that Defendants "must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether controlled substances are likely to be diverted from legitimate channels."[15] The Administration further confirmed that "suspicious orders include orders of an unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency"—criteria that "are disjunctive and are not all inclusive."[16] Moreover, a "registrant need not wait for a 'normal pattern' to develop over time before determining whether a particular order is suspicious. The size of an order alone, whether or not it deviates from a normal pattern, is enough to trigger the registrant's responsibility to report the order as suspicious."[17]

29.     In settlements with the DEA and U.S. Department of Justice, Defendants have repeatedly acknowledged their understanding of these obligations. For example, in May 2008, as part of a $13.25 million agreement to settle claims that it had failed to maintain effective controls to prevent diversion of opioids across six states, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders to the DEA" and agreed to "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform the DEA of suspicious orders as required by 21 C.F.R. § 1301.74(b), and follow procedures established by its CSMP."[18] In the same year, Cardinal paid its own $34 million penalty related to claims of opioid diversion from seven of its warehouses, including one in Auburn, Washington.[19] As a part of Cardinal's settlement, the company

---

[13] Letter from Joseph T. Rannazzisi, Deputy Assistant Administrator, Office of Diversion Control, DEA, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health Inc. v. Holder*, No. l:12-cv-00185-RBW, 846 F. Supp. 2d 203 (D.D.C. 2012), Dkt. No. 14-8.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] January 5, 2017 McKesson Settlement Agreement and Release, at ¶ III.B (discussing 2008 settlement agreement).

[19] U.S. Attorney's Office for the District of Colorado, *Cardinal Health Inc., Agrees To Pay $34 Million To Settle Claims That It Failed To Report Suspicious Sales Of Widely-Abused Controlled*

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

expressly agreed to adopt procedures through which "[o]rders that exceed established thresholds and criteria will be reviewed by a Cardinal employee trained to detect suspicious orders for the purposes of determining whether (i) such orders should not be filled and reported to the DEA or (ii) based on a detailed review, the order is for a legitimate purpose and the controlled substances are not likely to be diverted into other than legitimate medical, scientific, or industrial channels."[20]

30.     In addition to DEA guidance, Defendants' own industry group—the Healthcare Distribution Alliance ("HDA")—published compliance guidelines emphasizing distributors' obligations to actively monitor and report suspicious orders. Those guidelines, entitled *Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, stressed that distributors are "[a]t the center of a sophisticated supply chain," and thus "uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."[21]

31.     In short, for decades Defendants have known that their obligation to maintain "effective control against diversion of particular controlled substances" is not a mere formality. On the contrary, Defendants have been on notice that to comply with their legal duties, they must employ anti-diversion efforts that are legitimate and effective.

32.     Indeed, Defendants themselves have assured the public that they recognize—and take seriously—their duty to prevent diversion of opioids. For example, McKesson has publicly represented that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[22] AmerisourceBergen similarly proclaims on its website that the company ensures safe and secure distribution by, among other things, "continuously evaluat[ing], enhanc[ing],

---

*Substances* (Oct. 2, 2008) available at:
http://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

   [20] 2008 Cardinal Settlement Agreement.

   [21] *See* HDMA Industry Compliance Guidelines.

   [22] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, The Washington Post (Dec. 22, 2016), available at: http://wapo.st/2uR2FDy.

- 8 -

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

strengthen[ing] and expand[ing] the proven measures [they] have implemented to maintain the integrity of every order [they] ship."[23] But as detailed below, these claims have been proven manifestly false. The reality is that no Defendant has implemented meaningful—much less effective—controls against diversion.

**C. Defendants failed to implement effective safeguards to prevent diversion and pumped millions of opioids into Seattle without halting or reporting suspicious orders.**

33. Despite awareness of their legal obligations, Defendants have continuously failed to maintain effective controls to avoid diversion and to report and/or halt suspicious orders. Indeed, even in the face of a multitude of significant civil penalties, Defendants have continued to ship massive quantities of prescription opioids into Seattle despite knowing that the drugs are highly addictive and that there is an epidemic of opioid abuse, in the City and across the country, which has caused thousands of deaths and devastated communities.

34. Data from the ARCOS database[24] shows that between 2006 and 2012, Defendants directed more than 353,032,055 prescription opioid pills into King County.[25] That is enough pills to supply every man, woman and child in the county with 160 pills each. If nothing else, this high volume alone—which facially exceeds the reasonable medical needs of the community—should have alerted Defendants to the likelihood that suspicious orders were being filled. But that is not all. Recently unsealed evidence demonstrate that Defendants never instituted effective anti-diversion controls and—as a matter of corporate policy—turned a blind eye to suspicious

---

[23] https://www.amerisourcebergen.com/abcnew/fighting-the-opioid-epidemic.

[24] This ARCOS data was previously produced by the DEA in *In Re: National Prescription Opiate Litigation*, 17-md-1804 (N.D. Ohio), an MDL in which diversion and other claims have been asserted against Manufacturer and Distributor Defendants. By Order dated April 11, 2019, and over Defendants' objection, the MDL Court authorized the DEA to distribute county-level ARCOS data to government entities pursuing similar claims in state courts across the country. Seattle received ARCOS data related to distribution in King County on May 11, 2019. By Order dated July 15, 2019, the MDL Court lifted its protective order as to ARCOS data concerning shipments placed on or before December 31, 2012.

[25] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019), available at: https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

opioid shipments.[26] This abject failure to guard against the diversion of highly addictive narcotics has led to catastrophic human and economic consequences in Seattle and across the nation.

1.   **McKesson**

35.     Between 2006 and 2012, McKesson distributed 161,936,640 opioid pills into King County.[27] Despite knowledge of its statutory and regulatory duties, as well as its explicit contractual obligations under its 2008 settlement with the DEA, McKesson filled these millions of orders without implementing effective controls against diversion.

36.     Between 1997 and 2007—as the opioid crisis emerged—McKesson's anti-diversion program consisted of nothing more than the production of periodic reports documenting *retrospective* sales of controlled substances that exceeded a customer's 12-month purchase average. Critically, McKesson did not block any of the shipments it flagged as suspicious. McKesson's own regulatory affairs director has since acknowledged that "simply reporting larger than usual orders" did not satisfy the company's obligations under the CSA.[28]

37.     Furthermore, McKesson's system did not track generic drugs at all. Thus, when the DEA identified millions of generic hydrocodone shipments McKesson had made to rogue internet pharmacies over a three-week period in 2006, the company had to concede that— because those shipments involved generic formulations—McKesson's systems had never flagged them as suspicious.[29]

38.     In addition to being poorly constructed, McKesson's pre-2007 monitoring system was not seriously implemented. McKesson employees have acknowledged that, aside from

---

[26] The evidence was filed publicly on July 23, 2019, in *In Re: National Prescription Opiate Litigation*, 17-md-1804 (N.D. Ohio), Dkt. Nos. 1957, 1960, 1964, 1965 & 1967.

[27] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019), available at: https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/.

[28] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1964-28 (MCKMDL00510747).

[29] *Id.* at Dkt. No. 1964-30 (MCKMDL00496877-MCKMDL00496878).

- 10 -

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

confirming certain erroneous "fat fingered" orders, the company undertook no further investigation of orders that had been identified as excessive.[30]

39.     And, although McKesson did modify its anti-diversion protocols to some degree after its 2008 settlement with the DEA, the company embedded loopholes to ensure that its procedures remained ineffectual in practice. Tellingly, when introducing the changes, McKesson assured its pharmacy customers that they could continue to expect "business as usual."[31] Having just settled claims for past illegal conduct and having vowed to reform its practices, "business as usual" was the last thing McKesson should have been aiming for.

40.     McKesson's post-2008 system continued to be ineffective for several reasons. For one, while the system set monthly opioid thresholds for customers (above which orders would be flagged as suspicious), the thresholds were set far too high. Indeed, McKesson's Director of Regulatory Affairs acknowledged the "large gaps between the amount of Oxy or Hydro [customers] are allowed to buy (their threshold) and the amount they really need … [and that] This increases the opportunity for diversion by exposing more product for introduction into the pipeline than may be being used for legitimate purposes."[32]

41.     McKesson also routinely increased customers' thresholds without reasonable justification. According to internal company documents, requests for threshold increases were "almost automatic."[33] This was particularly the case for national retail pharmacies, for whom McKesson granted threshold increases without conducting any due diligence whatsoever. Unsurprisingly, many of these pharmacies have since been investigated and sanctioned by the DEA for diversion-related misconduct.

42.     Perhaps most troublingly, McKesson actively assisted its customers in circumventing the system by warning customers when they were approaching their threshold. This strategy allowed pharmacies to preemptively request increases—which invariably would be

---

[30] *Id.* at Dkt. No. 1964-29 (Snider Depo., 77:3-78:4).

[31] *Id.* at Dkt. No. 1910-1 at 84 (citing Dkt. No. 1964-41 (MCKMDL00543613)).

[32] *Id.* at Dkt. No. 1910-1 at 84 (citing Dkt. No. 1964-43 (MCKMDL00507799)).

[33] *Id.* at Dkt. No.1910-1 at 84 (citing Dkt. No. 1964-47 (MCKMDL00507223)).

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

granted—before sales were lost. As one McKesson employee put it: "We are in the business to sell product. If we could produce a report … that warned customers approach to a threshold, say at 85% of their 10,000 dosages, work could begin on justifying an increase in threshold prior to any lost sales."[34]

43.     In sum, McKesson's failure to employ effective safeguards against diversion was more than a mere oversight, it was an intentional corporate strategy designed to keep the profits rolling in. As perhaps the best illustration of its underlying motivations, when McKesson revamped its diversion controls in 2008, employees were explicitly instructed to "[r]efrain from using the word 'suspicious'" because "[o]nce McKesson deems an order and/or customers suspicious, McKesson is required to act."[35] The company's policies and blatantly inadequate monitoring protocols were specifically and intentionally designed to avoid this outcome whenever possible.

44.     Because of its continued failures to implement a proper anti-diversion program, McKesson was investigated for a second time by the DOJ in 2017 and paid additional civil penalties—this time a record $150 million.[36] Evidence uncovered during the government's investigation showed that McKesson had not maintained effective anti-diversion controls and failed to report and/or halt suspicious orders in 14 states, including Washington.[37] The DEA found, for example, that between June 2008 and May 2013, one McKesson distribution facility in Colorado "processed more than 1.6 million orders for controlled substances from June 2008 through May 13, 2013, but reported just 16 orders as suspicious, all connected to one instance related to a recently terminated customer."[38] On the basis of this and other evidence, the

---

[34] *Id.* at Dkt. No. 1910-1 at 86-87 (citing Dkt. No. 1964-65 (MCKMDL00543972)).

[35] *Id.* at Dkt. No. 1910-1 at 88 (citing Dkt. No. 1964-72 (MCKMDL005118078)).

[36] U.S. Dept. of Justice, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs* (Jan. 17, 2017), available at: https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[37] *Id.*

[38] DOJ January 17, 2017 Press Release, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, available at:

010396-30/1186224 V1

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

company was forced to admit that between 2009 and 2017 "it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious" under the regulatory framework and its 2008 settlement with the DEA.[39]

### 2.  Cardinal

45.     Cardinal has similarly filled suspicious orders for massive amounts of opioids without adopting effective anti-diversion controls. Between 2006 and 2012, Cardinal directed 62,661,200 opioid pills into King County.[40]

46.     By 2008, the DEA had already found that despite its "repeated attempts to educate Cardinal Health on diversion awareness and prevention, Cardinal engaged in a pattern of failing to report blatantly suspicious orders for controlled substances."[41] But, even after being forced to pay out $34 million in civil penalties in connection with its first diversion-related investigation, Cardinal chose to continue its illegal practices. Since the 2008 settlement, Cardinal has been sanctioned at least four other times for failing to maintain proper anti-diversion controls.

47.     In 2012, Cardinal reached a second settlement with the DEA stemming from its failure to detect and prevent suspicious orders from a distribution center in Florida. As part of that settlement, the company's license to distribute controlled substances from its Florida warehouse was suspended for two years after an investigation revealed that, in the span of three years, the distribution center had shipped more than 12 million dosage units of oxycodone to just four local pharmacies.[42] Cardinal admitted that its due diligence efforts and compliance with the

---

https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[39] *See* January 2017 DOJ Settlement Agreement and Release, at ¶¶ IV.A to IV.B, available at: https://dopl.utah.gov/orders/2018-149_SO_2018-04-09.pdf.

[40] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019), available at: https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/.

[41] *Id.*

[42] Drug Enforcement Agency, *DEA Suspends for Two Years Pharmaceutical Wholesaler Distributor's Ability to Sell Controlled Substances from Lakeland, Florida Facility* (May 15, 2012) available at: https://web.archive.org/web/20151009061847/http://www.dea.gov/divisions/hq/2012/pr051512p.html.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

prior settlement had been inadequate and again promised to strengthen its procedures for identifying and reporting suspicious orders.[43]

48.     But Cardinal continued to neglect its obligations and, in 2016, entered into two more settlements based on violations of the CSA. In one, the company paid more than $30 million in penalties after failing to report suspicious orders in Maryland and Florida, and failing to adhere to recordkeeping requirements in Washington.[44] In the other, Cardinal paid $10 million to resolve allegations that its subsidiary, Kinray, Inc., failed to report suspicious orders in New York.[45]

49.     Yet again, in January 2017, Cardinal paid out $20 million to the State of West Virginia to settle allegations that the company failed to report suspicious orders and negligently flooded that state with prescription opioids, contributing to an epidemic that caused more than 1,700 overdose deaths.[46]

50.     Cardinal's repeated failures to report suspicious shipments arose from what its own CEO has described as a "result-orientated culture" that could spawn "ill-advised or short-sighted decisions."[47] Indeed, before 2008, the company had virtually no system for monitoring suspicious shipments; it did nothing more than supply the DEA with monthly summaries showing purchase volumes. Cardinal's own consultant found these reports to be "not sufficient to

---

[43] *Id.*

[44] U.S. Attorney's Office for the District of Maryland, *Settlement resolves multiple investigations against Cardinal in Maryland, Florida, New York and Washington* (Dec. 23, 2016) available at: https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act; U.S. Attorney's Office for the Western District of Washington, *United States Reaches $34 Million Settlement with Cardinal Health for Civil Penalties under the Controlled Substances Act* (Dec. 23, 2016) available at: https://www.justice.gov/usao-wdwa/pr/united-states-reaches-34-million-settlement-cardinal-health-civil-penalties-under-0.

[45] *Id.*

[46] Ghose, Carrie, *Cardinal Health to pay West Virginia $20M to settle opiates lawsuit*, Columbus Business First (Jan. 9, 2017) available at: https://www.bizjournals.com/columbus/news/2017/01/09/cardinal-health-to-pay-west-virginia-20m-to-settle.html.

[47] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1910-1 at 88 (citing Dkt. No. 1964-72 (MCKMDL005118078)).

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

monitor deviations in ordering patterns on a real time basis."[48] And, even when it did identify a particular shipment as suspicious, Cardinal fulfilled the order anyway.

51.     It was not until 2008 that Cardinal began blocking shipments it had identified as suspicious. But even then, the company's systems for flagging such shipments remained inadequate. As its counterpart McKesson had done, Cardinal adopted customer-specific thresholds, above which shipments were identified as suspicious. But, similar to McKesson's, Cardinal's thresholds were too high because they were set in accordance with current, and thus already inflated, ordering volumes. Cardinal also performed little or no due diligence with respect to its chain pharmacy customers, wary that these retailers might "take their billions upon billions of dollars in business to any wholesaler in the country."[49]

52.     The result was a process that proved to be completely ineffective at identifying suspicious shipments. Indeed, Cardinal's internal documents show that between 2008 and 2013—during the height of the opioid crisis—it reported only a *few dozen* suspicious shipments to the DEA.[50] The company has now acknowledged that between 2012 and 2015, it failed to report at least 14,000 suspicious orders from "across the country," the "vast majority" of which included opioids.[51]

### 3.     AmerisourceBergen

53.     AmerisourceBergen distributed 68,810,395 opioid pills into King County between 2006 and 2012.[52] And, like the others, it did so without implementing effective controls against diversion.

54.     In 2007, the company's Orlando, Florida branch lost its DEA registration after it was discovered selling "large quantities" of hydrocodone to rogue pharmacies.[53] The DEA

---

[48] *Id.* at Dkt. No. 1964-7 (CAH_MDL2804_03309962; CAH_MDL2804_03309964).

[49] *Id.* at Dkt. No. 1964-16 (89(5) FOIL Appeal G000804 000006).

[50] *Id.* at Dkt. No. 1964-13 (CAH_MDL2804_03262438).

[51] *Id.* at Dkt. No. 1910-1 at 77 (citing Dkt. No. 1964-17 (Cameron Depo., 269:12-270:13)).

[52] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019), available at:
https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

1  suspended the license upon concluding that "the continued registration of this company

2  constitutes an imminent danger to public health and safety."[54]

3       55.    Prior to 2007, AmerisourceBergen maintained a "ship and report" policy—that is,

4  its corporate policy was to ship suspicious orders *before* they were reported to the DEA.[55] This

5  practice ensured no interruption in sales. To identify suspicious orders, AmerisourceBergen

6  posted signs within its distribution centers outlining customer ordering thresholds, and then

7  relied on distribution center employees' discretion to detect unusual orders.[56] But the company

8  had no division or group charged with implementing its diversion controls. Nor did it have any

9  policies in place to (a) compare a customer's orders with orders placed by similarly situated

10  customers; (b) compare a customer's orders of certain controlled substances relative to other

11  controlled substances; or (c) evaluate the frequency of customer orders.[57]

12       56.    It was not until 2007, after its Orlando center was shut down by the DEA, that

13  AmerisourceBergen began blocking any of the shipments it identified as suspicious. But even

14  then, the majority of those orders were ultimately filled with little or no documentation of due

15  diligence on AmerisourceBergen's part.[58]

16       57.    The other anti-diversion protocols implemented in 2007 were equally ineffectual

17  and similarly designed to fail. For example, the company's idea of "diligence" was a customer

18  questionnaire that, while in theory was meant to identify rogue pharmacies, was actually

19  completed by AmerisourceBergen sales representatives who were financially incentivized to

20  increase sales and unlikely to compile information that might limit distributions. Further limiting

21

22

23      [53] DEA April 24, 2007 Press Release, *DEA Suspends Orlando Branch of Drug Company from Distributing Controlled Substances*, available at: https://www.dea.gov/sites/default/files/divisions/mia/2007/mia042407p.html.

24      [54] *Id.*

25      [55] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1964-79 (Zimmerman Depo. I, 108:11-110:22).

26      [56] *Id.* at Dkt. No. 1964-82 (Mavs Depo. I, 173:19-174:9).

27      [57] *Id.* at Dkt. No. 1964-83 (Mavs Depo. II, 68:1-71; 72:1-5; 72:22-73:3).

28      [58] *Id.* at Dkt. No. 1910-1 at 94.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

the effectiveness of these questionnaires was the fact that they were used only for new—and not existing—customers, and no retail chain pharmacy was ever required to complete one.[59]

58.   The DEA investigated the company again in 2012 for failing to protect against diversion.[60] And in 2017, AmerisourceBergen agreed to pay West Virginia $16 million to settle claims that it had failed to monitor and report suspicious opioid shipments within that state. Nevertheless, while each of these regulatory actions prompted various minor changes in AmerisourceBergen's anti-diversion system, the company has never made a legitimate effort to ensure that its protocols are truly effective.

### 4.   Walgreens

59.   Walgreens also failed to meet its diversion monitoring requirements and failed to stop the shipment of suspicious orders, in violation of state and federal law.

60.   Walgreens is the second-largest pharmacy chain in the United States, with annual revenue of more than $118 billion. According to its website, the company operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in 2017 alone. From 2006 to 2012, Walgreens distributed 59,623,820 opioid pills into King County.[61]

61.   One thing that distinguishes Walgreens from the other Defendants is that Walgreens self-distributes, meaning that its distribution "customers" are its own individual pharmacies.[62] This fact makes Walgreens' failure to develop a proper monitoring system even more egregious. The company could have easily used its own pharmacies' data to determine the appropriate amount of opioids an individual pharmacy should be permitted to receive. But it

---

[59] *Id.* at Dkt. No. 1910-1 at 95 (citing Dkt. No. 1964-79 (Zimmerman Depo. I, 201:11-24; 213:16-214:9)).

[60] Jeff Overley, *AmerisourceBergen Subpoenaed by DEA Over Drug Diversion* (Aug. 9, 2012), LAW360, available at: https://www.law360.com/articles/368498/amerisourcebergen-subpoenaed-by-deaover- drug-diversion.

[61] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019), available at: https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/.

[62] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1965-5 (WAGMDL00757776).

- 17 -

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

turned a blind eye to this information, relying instead on an overly-lenient volume "three times" formula to identify suspicious orders.

62.     As part of a settlement with DEA in June 2013, Walgreens admitted that its "suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007 and December 27, 2007."[63]

63.     Indeed, Walgreens had long known that its monitoring system did not comply with its CSA obligations. In 2006, the DEA sent a Letter of Admonition citing the company for recordkeeping inadequacies and security deficiencies at its Perrysburg Distribution Center. The DEA specifically informed Walgreens that its formula for reporting suspicious orders was insufficient and should instead be based on size, pattern, or frequency. But, rather than redesign the system, Walgreens continued to utilize its "three times" formula to generate monthly Suspicious Control Order Reports that were sent to the DEA only *after* the orders had already shipped. These reports were generated on a nationwide basis and were thousands of pages or more in length.[64] Walgreens did not halt shipment of these orders or perform any due diligence on them before shipment.[65]

64.     Walgreens knew such post-shipment reports did not satisfy CSA requirements. Upon information and belief, senior Walgreens employees attended a September 2007 Pharmaceutical Industry Conference at which the DEA reminded distributors that the CSA required reporting suspicious *orders*, not just suspicious *sales* after the fact.

65.     Until September 2010, Walgreens's monitoring program flagged certain orders as suspicious but did not reduce, block or report such orders.[66] In addition, there were numerous

---

[63] *Id.* at Dkt. No. 1965-6 (WAGMDL00490964).

[64] *Id.* at Dkt. No. 1965-14 (Stahmann Depo., 282:8–289:1).

[65] *Id.* at Dkt. No. 1965-15 (Bratton 30(b)(6) Depo., Erratum No. 3).

[66] *Id.* at Dkt. No. 1965-43 (WAGMDL00077017).

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

loopholes that limited the program's effectiveness.[67] For instance, it only monitored orders that Walgreens stores placed to Walgreens's own distribution centers. If a store hit its limit with Walgreens, it could simply order more drugs through outside vendors like Cardinal.[68] Moreover, Walgreens often permitted stores to order additional opioids even after they had had hit their maximum.[69]

66.    In 2012, the DEA issued an Immediate Suspension Order for one of Walgreens's three Schedule II distribution centers, finding that the company's distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest."[70] The ISO contained a "statement of [the DEA's] findings regarding the danger to public health or safety"[71] posed by Walgreens's practices. Therein, the DEA specifically considered the Suspicious Control Drug Order reports and made the following findings of fact and conclusions of law[72] regarding Walgreens's suspicious order monitoring system:

- "[Walgreens's] practice with regard to suspicious order reporting was to send to the local DEA field office a monthly report labeled 'Suspicious Control Drug Orders.'"[73]

- "[The Suspicious Control Drug] reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title [Walgreens] attached to these reports."[74]

- Upon review of an example of the Suspicious Control Drug Order report for December 2011, "[Walgreens's] suspicious order report for December 2011 appears to include suspicious orders placed by its customers for the past 6 months. The report for suspicious orders of Schedule II drugs alone

---

[67] Id. at Dkt. No. 1965-44 (Polster Depo., 157:9-18).

[68] Id. at Dkt. No. 1965-15 (Bratton 30(b)(6) Depo., 258:8-17).

[69] Id. at Dkt. No. 1965-49 (WAGMDL00705318).

[70] Id. at Dkt. No. 1910-1 at 108 (citing Dkt. No. 1965-16 (WAGMDL00387653)).

[71] 21 C.F.R. § 1301.36(e).

[72] Walgreens does not dispute that ISO contains final findings of fact and conclusions of law. See Brief of Petitioner [Walgreen Co.], Walgreen Co. v. Drug Enforcement Administration, et al., CV No. 12-1397, Doc. #1411758 (D.C. Cir. Dec. 26, 2012) (ISO contains "'final determinations, findings, and conclusions' made by DEA") (citing 21 U.S.C. § 877).

[73] In Re: National Prescription Opiate Litigation, 17-md-2804 (N.D. Ohio), Dkt. No. 1965-17 (WAGMDL00387654).

[74] Id.

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

is 1,712 pages and includes reports on approximately 836 pharmacies in more than a dozen states and Puerto Rico."[75]

- Finding that the reports failed to appropriately consider the population and area being served by the pharmacy: "This report from the Jupiter Distribution Center covers pharmacies in multiple states and Puerto Rico, yet the average order and trigger amount is the same for a particular drug regardless of the pharmacy's location, the population it serves, or the number of other pharmacies in the area."[76]

- "As made clear in 21 CFR 1301.74(b), *Southwood*, and the December 27, 2007 letter to distributors from the Deputy Assistant Administrator for the Office of Diversion Control, suspicious orders are to be reported *as discovered*, not in a collection of monthly completed transactions. Moreover, commensurate with the obligation to identify and report suspicious orders as they are discovered is the obligation to conduct meaningful due diligence in an investigation of the customer and the particular order to resolve the suspicion and verify that the order is actually being used to fulfill legitimate medical needs. This analysis must take place *before* the order is shipped. No order identified as suspicious should be fulfilled until an assessment of the order's legitimacy is concluded."[77]

- "Notwithstanding the ample guidance available, Walgreens has failed to maintain an adequate suspicious order reporting system and as a result, has ignored readily identifiable orders and ordering patterns that, based on the information available throughout the Walgreens Corporation, should have been obvious signs of diversion occurring at Respondent's customer pharmacies. *See* 21 C.F.R. § 1301.74(b); *see also Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487 (2007)."[78]

- "DEA's investigation … revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. §1301.74(b). 21 C.F.R. § 1301.74(b)."[79]

- "… DEA investigation of [Walgreens's] distribution practices and policies … demonstrates that [Walgreens] has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(l) and (e)(l). [Walgreens] failed to conduct adequate due diligence of its retail stores, including but not limited to, the six stores identified above, and continued to distribute large amounts of controlled substances to pharmacies that it knew or should have known were dispensing those controlled substances pursuant to prescriptions written for other than a legitimate medical purpose by practitioners acting outside the usual course of their professional practice."

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

- "[Walgreens has not] recognized and adequately reformed the systemic shortcomings discussed herein."

- "[DEA's] concerns with [Walgreens's] distribution practices are not limited to the six Walgreens pharmacies [for which DEA suspended Walgreens's dispensing registration]."[80]

67.     The 2012 investigation ultimately led to what was the largest settlement in DEA history at the time—$80 million—to resolve allegations that Walgreens committed an unprecedented number of recordkeeping and dispensing violations, including negligently allowing controlled substances such as oxycodone and other painkillers to be diverted for abuse and illegal black market sale.[81]

68.     Although the settlement stemmed initially from the DEA's investigation into Walgreens's distribution center in Jupiter, Florida, it ultimately resolved allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.[82]

69.     Walgreens's operations in Florida clearly demonstrate how the company's egregious conduct facilitated the diversion of prescription opioids. Walgreens's corporate headquarters pushed hard to increase sales of oxycodone to its Florida pharmacies. The company provided bonuses for pharmacy employees based on the number of prescriptions filled and ranked its Florida stores according to the number of prescriptions dispensed. In June 2010, the company found that its highest-ranking store in terms of oxycodone sales had sold nearly 18 prescriptions of the drug *per day*. All of these prescriptions were filled by the Jupiter distribution center.[83] In 2011, each of Walgreens's Florida pharmacies allegedly ordered more than one

---

[80] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1965-17 (WAGMDL00387663).

[81] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-undercontrolled.

[82] *Id.*

[83] *Id.*

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

million dosage units of oxycodone—over ten times the average amount.[84] These pharmacies also increased their orders over time—in some cases as much as 600% in the span of just two years—including, for example, one that supplied a town of 3,000 residents with 285,800 orders of oxycodone in a single month.

70.     Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[85] In January 2017, an investigation by the Massachusetts Medicaid Fraud Division found that, from 2010 to 2015, multiple Walgreens stores across the state had failed to monitor the opioid use patterns of high-risk patients and failed to use sound professional judgment when dispensing opioids and other controlled substances—despite the fact that overdose death rates were soaring and growing by the day.

71.     Corporate officers at Walgreens turned a blind eye to these abuses. In fact, in-house attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring the general attitude of a company that placed profits and self-preservation above compliance with the law—and even more importantly above the health and wellbeing of the communities it serves.[86]

**D.     Defendants coordinated and concealed their ineffective anti-diversion practices.**

72.     As reflected in the foregoing, not only are Defendants' monitoring programs flawed, they share many of the same inadequacies. This is no coincidence. Indeed, Defendants developed their programs in coordination with one another, including through their trade group, the HDA.[87]

---

[84] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012).

[85] *Walgreens to pay $200,000 settlement for lapses with opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

[86] *Id.*

[87] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Oh.), Dkt. No. 1979-7, at 37-38 (HDA 30(b)(6) deposition) (confirming that, along with numerous other opioid distributors and manufacturers, Cardinal, McKesson, and AmerisourceBergen each belong to the HDA).

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

73.     The HDA is a vehicle for collective action. By its own account, the HDA provides Defendants with a forum for "networking" and building "alliances."[88] The HDA openly encourages members to participate in working groups to provide "guidance" and "leadership" on a variety of issues affecting the industry, including "DEA regulation of distribution" and "supply chain issues."[89] In 2007, in response to heightened government scrutiny, the HDA's membership began "developing a comprehensive DEA strategy," including with respect to the identification of suspicious orders.[90] Internal documents show that HDA members became especially concerned about the "surge in DEA enforcement around suspicious shipments" and felt the industry needed "to quickly develop a plan to deal with and work with the DEA as necessary."[91] As part of this effort, the HDA collected copies of its "member companies' suspicious order policies and procedures."[92] Members then convened privately to discuss "best practices" in response to DEA enforcement and to brainstorm "next steps."[93] In January 2008, as part of a monthly meeting with the Pain Care Forum ("PCF"), an opioid-advocacy front group, the HDA apprised PCF members—including opioid manufacturers and pharmacies—of the DEA's enforcement actions and steps the HDA was taking in response.[94] Given this extraordinary level of industry coordination, it is no surprise that Defendants' inadequate monitoring programs share uncanny similarities.

74.     And, while they clearly made it no priority to take the necessary (and legally-mandated) steps to prevent diversion of the dangerous drugs they were selling, Defendants spared no efforts in avoiding detection of and actively concealing their own unlawful, unfair, and fraudulent conduct.

---

[88] *See* https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

[89] *See* https://www.hda.org/about/councils-and-committees#Committees.

[90] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Oh.), Dkt. No. 1979-7, at 61-62 (HDA 30(b)(6) deposition).

[91] *Id.* at 68.

[92] *Id.* at 121.

[93] *Id.* at 137.

[94] *Id.* at 139-140.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

75.     For example, Defendants concealed their conduct by resisting the distribution of ARCOS and other data showing the staggering number of suspicious opioid shipments that have been directed into King County and elsewhere. Having only recently obtained this data by court order, Seattle had no prior means of confirming whether these Defendants violated their obligations to monitor, report, and halt suspicious shipments in this region.

76.     Defendants further concealed their misconduct by projecting a false aura of corporate responsibility. As described above, Defendants have publicly recognized their duty to carefully monitor the opioid supply chain to detect and report instances of diversion. And they claim to be doing so. In reality, however, and as the public record now reveals, Defendants did not honor these commitments in Seattle and elsewhere.

77.     In sum, Defendants successfully concealed the facts sufficient to arouse suspicion of the claims that Seattle now asserts. The City did not know of the existence or scope of Defendants' misconduct and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**E.      Defendants' conduct foreseeably led to an opioid epidemic that has wrought havoc on Seattle communities.**

78.     By failing to implement proper safeguards against diversion, Defendants have unnecessarily flooded Seattle with opioids, resulting in widespread addiction, overdose, and death. The opioid prescribing rate in King County for 2011 was 66%, meaning that 66 opioid prescriptions were issued for every 100 residents.[95] Although local and state officials have since made a concerted effort to combat opioid abuse, as detailed below, the prescribing rate in King County remained above 40% in 2017.[96]

79.     Misuse, abuse, and fatalities have inevitably resulted from the staggering number of pills Defendants pushed into Seattle. By 2009, opioids had become by far the leading cause of

---

[95] CDC Report, U.S. County Prescribing Rates, 2011, available at: https://www.cdc.gov/drugoverdose/maps/rxcounty2011.html.

[96] CDC Report, U.S. County Prescribing Rates, 2017, available at: https://www.cdc.gov/drugoverdose/maps/rxcounty2017.html.

- 24 -

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

drug-related death in the county, with 8.59 deaths per 100,000 residents reported.[97] Moreover, prescription opioid abuse has not displaced heroin, but rather triggered a resurgence in its use. Individuals who are addicted to prescription opioids often transition to heroin because it is a less expensive, readily available alternative that provides a similar high.[98] Nationwide studies confirm that nearly 80% of all people who began to abuse opioids in the early 2000s, started with prescription drugs.[99] And the same pattern holds true in Seattle. Approximately 41% of heroin users interviewed at a Seattle syringe exchange in 2015 reported using pharmaceutical opioids—an increase of 30% in 2011—and another 53% stated that they were "hooked on prescription-type opiates prior to using heroin."[100] Evergreen Health Services, a local nonprofit which provides medication and assisted treatments for adults with opioid abuse disorders, estimate that 90% of the patients it treats started down the road to addiction with prescription opioids.

80.     As prescription opioid users turned to heroin, heroin-related overdose deaths also skyrocketed. By 2015, overdoses attributed to either prescription opioids or heroin accounted for approximately two-thirds of all drug related deaths in King County.[101]

81.     In King County, heroin and prescription opioids are involved in more overdose deaths than any other drug. In 2018, there were 277 overdose deaths in the county that involved at least one type of opioid.[102] Of those deaths, 100 were caused by prescription opioids and 156 involved heroin.

---

[97] University of Washington, Alcohol and Drug Abuse Institute, online report, available at: https://adai.washington.edu/WAdata/KingCountyDrugDeaths.htm.

[98] JAMA Psychiatry, *The Changing Face of Heroin Use in the United States:  A Retrospective Analysis of the Past 50 Years*, May 28, 2014, available at: https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575; Heroin and Prescription Opiate Addiction Task Force, Final Report and Recommendations, September 15, 2016, at 4.

[99] *Id*.

[100] University of Washington, Alcohol and Drug Abuse Institute, 2015 Drug Use Trends in King County Washington, dated July 2016, at 3.

[101] *Id.*

[102] Public Health Dept. Seattle & King County, 2018 Overdose Death Report, available at: https://www.kingcounty.gov/depts/health/~/media/depts/health/medical-examiner/documents/2018-overdose-death-report.ashx.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1

2

3

4

5

6

7

8

9

10

11



Source: *Produced by Public Health-Seattle and King County*

12       82.       And, while overdose rates are clearly a countywide issue, the problem is

13   particularly acute in Seattle. Indeed, between 2016 and 2017, 53% of all overdose deaths within

14   King County occurred in Seattle.[103]

15

16

17

18

19



20

21

22

23

Source:  King County Medical Examiner data

24

25       83.       Statewide in 2017, there were 742 overdose deaths involving opioids—a rate of

26   9.6 deaths per 100,000 persons.[104] 343 of those deaths involved prescription opioids specifically.

27       _____

28       [103] Public Health Dept. Seattle & King County, 2017 Overdose Death Report, available at:
https://www.kingcounty.gov/depts/health/news/2018/May/~/media/depts/health/medical-
examiner/documents/2017-overdose-death-report.ashx.

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1



**Figure 1. Number of overdose deaths involving opioids in Washington, by opioid category.** Drug categories presented are not mutually exclusive, and deaths might have involved more than one substance. Source: CDC WONDER.

84.     Opioid abuse is also a leading cause of non-lethal drug poisonings and associated medical treatments, which are frequently provided at public expense. In just the first six months of 2019, there were 1,291 opioid-related emergency department encounters in King County—most of which took place at Seattle hospitals.[105] In the same time period, there were 1,228 probable opioid overdoses treated by King County EMS agencies.[106]

85.     Publicly-funded drug treatment admissions in King County for the abuse of prescription opioids has increased—492% between 1999 and 2010.[107] In 2015, the King County Mental Health, Chemical Abuse and Dependency Services Division reported that opioids were the primary substance used by 62% of persons admitted for detoxification treatment.[108] And, for

---

[104] National Institute on Drug Abuse, Opioid-Involved Overdose Deaths, 2019, available at: https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/washington-opioid-summary.

[105] King County Public Health Non-fatal Overdose Statistics, available at: https://www.kingcounty.gov/depts/health/overdose-prevention/non-fatal.aspx.

[106] *Id.*

[107] University of Washington, Alcohol and Drug Abuse Institute, 2015 Drug Use Trends in King County Washington, dated July 2016, at figure 3a.

[108] King County Mental Health, Chemical Abuse and Dependency Services Division, Substance Abuse Prevention and Treatment Annual Report, 2015, at 20.

**Peter S. Holmes**
Seattle City Attorney
701 5ᵗʰ Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

each year between 2006 and 2015, King County poison centers reported more calls for

pharmaceutical opioids than any other drug.[109]

| Drug | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Pharmaceutical Opioids* | *3,532* | *3,572* | *3,824* | *3,735* | *808* | *943* | *779* | *567* | *571* | *528* |
| Benzodiazepines | 2,071 | 2,200 | 2,521 | 2,403 | 541 | 536 | 495 | 437 | 395 | 385 |
| Dextromethorphan | 2,198 | 2,113 | 1,764 | 1,545 | 395 | 369 | 286 | 298 | 293 | 284 |
| Oxycodone | 1,032 | 1,113 | 1,208 | 1,278 | 294 | 351 | 261 | 179 | 168 | 164 |
| Hydrocodone | 1,192 | 1,146 | 1,212 | 1,113 | 222 | 235 | 210 | 172 | 149 | 140 |
| Cannabinoids/Marijuana/THC | 119 | 150 | 152 | 155 | 57 | 111 | 83 | 80 | 115 | 112 |
| Amphetamine e.g. Adderall | 526 | 473 | 486 | 410 | 106 | 108 | 123 | 113 | 104 | 95 |
| Methylphenidate e.g. Ritalin, Concerta | 286 | 324 | 342 | 316 | 81 | 72 | 66 | 62 | 52 | 70 |
| Heroin | 39 | 40 | 63 | 58 | 21 | 34 | 40 | 49 | 75 | 60 |
| Tramadol | 234 | 302 | 392 | 331 | 74 | 85 | 68 | 57 | 56 | 52 |
| Methamphetamine | 64 | 48 | 103 | 110 | 24 | 55 | 60 | 60 | 46 | 52 |
| Codeine | 429 | 348 | 379 | 382 | 80 | 69 | 59 | 48 | 57 | 51 |
| Buprenorphine | 0 | 0 | 0 | 0 | 5 | 48 | 50 | 30 | 30 | 33 |
| Methadone | 398 | 430 | 396 | 407 | 88 | 77 | 62 | 40 | 46 | 33 |
| Morphine | 226 | 209 | 217 | 211 | 43 | 43 | 35 | 22 | 29 | 29 |
| Cocaine | 154 | 133 | 132 | 102 | 39 | 93 | 50 | 23 | 30 | 27 |
| Carisoprodol e.g. Soma | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 25 |
| Hallucinogenic amphetamine e.g. MDMA | 114 | 81 | 87 | 65 | 21 | 25 | 24 | 37 | 28 | 15 |
| Hydromorphone | 0 | 0 | 0 | 0 | 0 | 18 | 21 | 10 | 24 | 14 |
| Cyclobenzaprine e.g. Flexeril | 123 | 157 | 156 | 168 | 37 | 15 | 15 | 11 | 10 | 12 |
| LSD | 11 | 11 | 7 | 10 | 1 | 1 | 6 | 10 | 6 | 10 |
| GHB and analog/precursor | 19 | 10 | 18 | 16 | 9 | 1 | 6 | 7 | 7 | 9 |
| Fentanyl | 0 | 0 | 0 | 0 | 1 | 14 | 10 | 8 | 10 | 7 |
| Ketamine and analogs | 8 | 1 | 5 | 5 | 5 | 5 | 1 | 5 | 5 | 5 |
| Meperidine | 21 | 24 | 20 | 13 | 1 | 0 | 2 | 1 | 0 | 3 |
| Oxymorphone | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 2 |

86.     The opioid epidemic has also had a significant detrimental impact on teenagers

and young adults. A 2018 Healthy Youth Survey indicated that approximately 2,500 Washington

State 12th graders had tried heroin at least once and even more—about 3,500—used pain killers

to get high in any given month.[110] In response to shocking statistics and studies which show that

fatal opioid overdoses among children and adolescents increased nearly threefold in the U.S.

between 1999 and 2016, Governor Jay Inslee recently signed into law a bill that will require

public high schools across Washington to stock naloxone for their students starting in the 2020-

21 school year. Individuals under the age of 30 are the largest growing group in King County

---

[109] University of Washington, 2015 Drug Use Trends in King County Washington, at Figure 6.

[110] Healthy Youth Survey Fact Sheet, available at:
https://www.doh.wa.gov/Portals/1/Documents/8350/160-NonDOH-DB-Opiates.pdf.

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

seeking opiate detoxification treatment. In 2006, 210 young adults sought treatment in King County for opiate addiction. By 2014, that number had grown to 906.[111]



87.     Even infants have not been immune to the impact of opioid abuse. In Washington, the number of newborns diagnosed with Neonatal Abstinence Syndrome ("NAS")—increased by more than 600% between 2000 and 2013.[112] NAS is a post-natal drug withdrawal syndrome that occurs among opioid-exposed infants shortly after birth, often manifested by central nervous system instability, autonomic over-reactivity, and gastrointestinal tract dysfunction. NAS is associated with increased incidence of seizures, respiratory problems, feeding difficulties and low birth weight, along with common symptoms of drug withdrawal, including diarrhea, excessive crying, fever, hyperactive reflexes, and sleeping difficulties. The State's Office of Financial Management has studied cases in which a pregnant mother received a drug-use diagnoses during her maternal stay and concluded that opioids (including heroin) "had, by far, the highest rates and greatest number of cases—and they are markedly trending upwards."[113]

88.     Homelessness in Seattle is a complicated issue, and opioid abuse is one of its causes. The 2019 Count Us In annual Point In Time (PIT) count for Seattle and King County, found a total of 11,199 people experiencing homelessness countywide. And death reports indicate that opioid abuse is increasingly responsible for fatalities within this growing

---

[111] King County, Heroin and Opioid Trends, available at: https://www.kingcounty.gov/depts/community-human-services/mental-health-substance-abuse/task-forces/heroin-opiates-task-force.aspx#about.

[112] National Institute on Drug Abuse, Opioid-Involved Overdose Deaths, 2019, available at: https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/washington-opioid-summary.

[113] Washington State Office of Financial Management, *Maternal and Newborn Inpatient Stays with a Substance Use or Use-Related Diagnosis*, February 2016, at 3.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

population.[114] In 2018, 16% of the opioid overdoses in King County were among people experiencing homelessness.[115] The high rate of opioid use among the homeless population is further compounded by the obstacles that homeless people must overcome to obtain treatment. Data obtained by the Seattle Public Health King County Needle Exchange Program shows that only 48% of the homeless population successfully accesses methadone treatment, compared to a 75% success rate among users who are stably housed.[116]

89.     Law enforcement statistics reflect a rise in opioid abuse. The percent of King County drug seizures testing positive for heroin has increased nearly six-fold—from 7% in 2008 to 40% in 2015.[117] In 2015, more than 45% of drug seizures by King County law enforcement involved either prescription opioids or heroin.[118]

90.     As this data reflects, prescription opioid misuse, abuse, and overdose has catastrophic impacts. Beyond the tragic repercussions for addicted individuals—including overdoses, job loss, loss of custody of children, physical and mental health problems, homelessness and incarceration—opioid abuse causes instability in communities and unsustainable demand on community services such as hospitals, courts, child services, treatment centers, and law enforcement. These are costs that Seattle must bear.

---

[114] Heroin and Prescription Opiate Addiction Task Force, Final Report and Recommendations, September 15, 2016, at 6.

[115] Public Health Seattle & King County, 2018 Overdose Death Report, available at: https://www.kingcounty.gov/depts/health/news/2019/July/2-overdose.aspx.

[116] King County Heroin and Opioid Task Force, Heroin and Opioid Trends, available at: http://www.kingcounty.gov/depts/community-human-services/mental-health-substance-abuse/task-forces/heroin-opiates-task-force.aspx.

[117] King County, Heroin and Opioid Trends, available at: https://www.kingcounty.gov/depts/community-human-services/mental-health-substance-abuse/task-forces/heroin-opiates-task-force.aspx#about.

[118] University of Washington, Alcohol and Drug Abuse Institute, online study available at: https://adai.washington.edu/WAdata/King_County_cases.htm.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

**F.   Defendants' conduct has severely impacted Seattle and has caused the City substantial economic injury.**

91.     Seattle has expended millions of dollars trying to combat the opioid epidemic that is ravaging its communities. The City has suffered economic injuries that are direct, ascertainable, quantifiable, and that would not have been incurred but for Defendants' conduct.

**1.   Public Health Services**

92.     The Seattle Human Services Department invests over $12.6 million annually in public health initiatives, a significant portion of which are devoted to treating opioid addiction.

93.     The City spends, for instance, hundreds of thousands of dollars each year on methadone and buprenorphine[119] treatments for opioid addicts. This treatment is labor intensive, with patients being seen six days per week initially. Random urine testing and regular counseling sessions are also mandatory for all patients being treated with methadone or buprenorphine and further add to the cost. The Seattle & King County Public Health Department opened the Buprenorphine Pathways Program in January 2017. The program, which provides same-day medication starts onsite, was at capacity within 13 weeks with people lining up two hours before opening to receive care.

94.     Because of the surge in heroin use, the City has been forced to confront the very serious public health hazards posed by hypodermic needles. King County spends $1.2 million per year on its needle exchange program.[120] In 2016, Seattle Public Utilities started a pilot program to collect needles as one of several test initiatives aimed at improving the safety and cleanliness of the City's neighborhoods. In the first 15 months of operation, the program collected and safely disposed of 32,012 hypodermic syringes.[121] On March 30, 2018, the Seattle

---

[119] Buprenorphine, also known by its brand name, Suboxone, is an alternative to methadone with a different delivery system. It can be taken in a pill or on a film, and is thus easier for patients traveling. Like methadone, buprenorphine can diminish opioid dependency and reduce the risk of overdose.

[120] Public Health Seattle & King County, King County Needle Exchange, available at: https://www.kingcounty.gov/depts/health/communicable-diseases/hiv-std/patients/drug-use-harm-reduction/needle-exchange.aspx.

[121] Capitol Hill Seattle Blog, *'Sharps' program collecting 2,000+ old needles a month across Seattle* (Oct. 24, 2017) available at: https://www.capitolhillseattle.com/2017/10/sharps-program-collecting-2000-old-needles-a-month-across-seattle/.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

Public Library system announced its plan to install sharps containers in all restrooms at its downtown, Ballard, University District, and Capitol Hill branches after a custodian was pricked with a hypodermic needle at the Ballard library.[122] Local businesses have similarly had to install sharps boxes in their facilities after employees have reported finding blood and needles in bathrooms, as well as being pricked by improperly discarded needles.[123]

95.     Seattle also makes substantial annual contributions to the King County Needle Exchange which operates programs in Belltown, Capitol Hill, and the University District. At each needle exchange location, opioid addicts can exchange used syringes for sterilized ones while receiving basic health services, including infectious disease testing, Hepatitis A and B vaccinations, and treatment readiness counseling. In total, 7.9 million syringes were distributed in King County in 2018, up from 7.1 million in 2017.[124]



---

[122] Seattle Magazine, *Seattle Public Library Will Now Install Sharps Containers at Some Branches* (Nov. 27, 2018) available at: http://www.seattlemag.com/news-and-features/seattle-public-library-will-now-install-sharps-containers-some-branches.

[123] Business Insider, *Drugs and syringes have become such a problem in Starbucks bathrooms that the company is installing needle-disposal boxes in certain locations* (Jan. 9, 2019) available at: https://www.businessinsider.com/starbucks-workers-petition-bathroom-needle-disposal-boxes-2019-1?.

[124] Public Health Seattle & King County, 2018 Overdose Death Report, available at: https://www.kingcounty.gov/depts/health/news/2019/July/~/media/depts/health/medical-examiner/documents/2018-overdose-death-report.ashx.

010396-30/1186224 V1

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

### 2.    Paramedic Services

96.    Seattle has also expended substantial financial resources to support first responders who provide services and medical interventions for opioid addicts. Every year, the Seattle Fire Department responds to thousands of 911 calls which arise from prescription opioid or heroin abuse and require the use of naloxone (aka Narcan), a drug that can reverse an opioid overdose. Naloxone is costly and has a short shelf life, meaning that supplies of the drug must be regularly replenished. In total, each one of these medical response calls cost the City an average of $2,000. In 2017, over the span of just three months, the Seattle Fire Department administered naloxone 140 times—more than once per day—costing the City approximately $280,000 for these calls alone. These expenses are in addition to the cost of purchasing the injectors needed to administer naloxone and the cost of training personnel on their proper use.

97.    The Seattle Fire Department responds to an even greater number of opioid-related medical emergencies in which naloxone is not administered, including overdoses that are not life threatening. In the three months preceding September 25, 2017, records maintained for at least 453 separate Seattle Fire Department calls contain opioid-related terms, such as "methadone" or "heroin." At $2,000 per response, that equates to a cost of $906,000 to the City.

### 3.    Policing Services and Criminal Justice Costs

98.    Seattle police also carry naloxone and respond to instances of opioid overdose throughout the City. Between July and August of 2016, Seattle police officers responded to 49 drug-involved incidents in which opioids were certainly or likely involved. Police officers responded to an additional 234 drug-related incidents in which opioids could not be ruled out. In addition to the cost of equipping the police department with naloxone, officers also must receive training in its proper application.

99.    Due to rising rates of opioid-related crime in Seattle, the City's police officers also must spend a significant amount of time addressing and prosecuting opioid-related offenses. This detracts greatly from their ability to devote time to the many other services they are counted on to provide.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

100.     Moreover, to address the opioid-related crises occurring every day across the City, police officers require special training, which Seattle has spent millions providing. In 2017, for example, Seattle police officers spent 31,200 hours in Crisis Intervention Training ("CIT"), at costs approaching $2 million. Nearly half of Seattle's police department has been certified in CIT, at additional costs exceeding $1 million. The Seattle Police Department spent another $188,000 for other drug-related training in the same year.

101.     When Seattle police officers take opioid-addicted criminal offenders to the King County Jail, or to other local jails, the City is "billed back" for the fees and costs associated with the incarceration. Seattle jail facilities have been inundated with opioid addicts who, upon detention, undergo dangerous drug withdrawal. Treating these individuals is both labor and cost intensive, with many Seattle-area nurses spending substantial amounts of time in jail quarantine units providing the necessary care. Moreover, addicts experiencing serious withdrawal are often not healthy enough to be placed in general population modules, and must be transported to a medical unit that bills Seattle at significantly higher costs per day.

102.     In collaboration with King County, Seattle has pioneered the Law Enforcement Assisted Diversion ("LEAD") program, which diverts low-level drug abusers out of the criminal-justice system and into community-based care programs where they can receive nourishment, access to treatment services, and job training. Although costly to operate, LEAD has substantially reduced recidivism in Seattle. According to a 2015 University of Washington study, participants in the LEAD program are 58% less likely to be arrested than people in a control group.[125] LEAD has now been replicated by dozens of cities and counties across the country.[126] In the last three years, Seattle has contributed more than $5 million to fund the continued operation and expansion of LEAD.

---

[125] *See Innovative Law Enforcement Assisted Diversion (LEAD) Program is Showing Success*, Press Release April 8, 2015, available at: https://depts.washington.edu/harrtlab/wordpress/wp-content/uploads/2015/04/2015-04-08-LEAD-Press-Release-and-Evaluation-Summary.pdf.

[126] *See* https://www.leadbureau.org/; *see also* Nicholas Kristof, Op-Ed, *Seattle Has Figured Out How to End the War on Drugs*, N.Y. Times, Aug. 23, 2019, available at: https://www.nytimes.com/2019/08/23/opinion/sunday/opioid-crisis-drug-seattle.html.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

### 4.   Combatting Homelessness

103.   The opioid crisis has contributed to the City of Seattle's crisis involving homelessness. City agencies have been forced to devote ever-increasing resources toward combatting homelessness and its effects.

104.   Seattle spends approximately $2.9 million each year to provide health care for the homeless through community health clinics and mobile medical programs. In addition, a number of municipal departments—including the Department of Parks and Recreation, Public Utilities Department, Department of Transportation, and Finance and Administrative Services Department—have spent millions of dollars on outreach, medical, and counseling services for unhoused persons living in encampments across the City.

105.   The City also makes significant investments to clear encampments and clean the sites. Before the encampments can be cleared, the City makes every effort to provide counseling services to the people who have been living there and to assist them in locating alternative housing. Extensive and repeated notice is also provided. Personal belongings are carefully cataloged and stored for future pickup or delivery to owners (with the associated fees being paid by Seattle). Moreover, the encampments generate an enormous amount of trash which must be hauled away at the City's expense. Cleaning the sites almost always involves disposing of needles that have been used to inject opioids. In 2017, Seattle's Department of Parks and Recreation spent over $800,000 to clear 3,000 tons of waste from 140 homeless encampments, nearly all of which contained hypodermic needles. Since Seattle's homeless clean-up programs began, the City has removed millions of pounds of garbage and collected more than 111,000 syringes.[127]

106.   All of these efforts have necessitated additional staffing across multiple departments. In 2017, the Seattle Police Department, for example, had 15 full-time officers working exclusively on homelessness, and the Mayor's Office had three full-time employees devoted to the issue. In February 2017, the City launched a Navigation Team—a group of

---

[127] City of Seattle 2019-2020 Biennial Budget Proposal, available at: http://durkan.seattle.gov/wp-content/uploads/2018/09/Fact-Sheet-Addressing-our-Homelessness-and-Housing-Crisis.pdf.

- 35 -

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

specially-trained police officers and outreach workers—to engage unsheltered people living in tents in unsanctioned areas of Seattle and to sweep homeless encampments. In April 2019, the City hired three more people to the Navigation Team as part of a $244,000 expansion initiative, bringing the total number of personnel to 38. In total, Seattle spent $86.7 million combatting homelessness in 2018 and has a proposed budget of $89.5 million in 2019.[128]

107.    The foregoing costs exemplify, but do not exhaustively demonstrate, the immense burden that Defendants' conduct has imposed on Seattle. For the City to recover from this crisis, additional resources are critically needed to support community health programs, sponsor preventative education, fund naloxone distribution, monitor opioid prescribing, safely dispose of unused pills, police opioid-related crime, and process and rehabilitate opioid offenders through the criminal justice system.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### WASHINGTON CONSUMER PROTECTION ACT ("WCPA")
### RCW CHAPTER 19.86

108.    Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

109.    The Washington Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. To prevail on a WCPA claim, a plaintiff must prove (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation.

110.    Under Washington law, a practice is unfair or deceptive if it has the capacity to deceive a substantial portion of the public.

111.    As alleged herein, Defendants engaged in unfair practices when they distributed massive amounts of opioids without any meaningful safeguards against diversion even as it became obvious that opioid addiction was becoming a major health crisis. Defendants also

---

[128] *Id.*

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

concealed their misconduct despite knowing the devastating impacts they were imposing on Seattle communities.

112.    In particular, Defendants' unfair acts or practices, included the following:

a.      Failing to implement effective controls against the diversion of prescription opioids;

b.      Failing to conduct adequate due diligence to ensure that they were only filling legitimate orders for legitimate customers;

c.      Failing to identify potentially suspicious orders;

d.      Filling orders which their internal monitoring systems flagged as potentially suspicious, without engaging in adequate due diligence; and

e.      Failing to report suspicious orders to law enforcement.

113.    The distribution and sale of opioids to pharmacies and health care providers in Seattle constitutes "trade" or "commerce" as defined by RCW 19.86.010(2).

114.    Defendants' unfair conduct in the distribution and sale of opioids is contrary to public policy and affects the public interest because the opioids were distributed to Seattle businesses and ultimately to consumers in Seattle, injured numerous consumers, created a public health crisis and a public nuisance, were part of Defendants' business model and regular course of business operations, and were repeated.

115.    Seattle has incurred serious financial harm as a result of Defendants' conduct, in particular the burden of significant and ongoing expenses related to combatting the opioid epidemic.

116.    But for Defendants' misconduct, opioid abuse could not and would not have become so rampant, the massive public health crisis that now exists would have been substantially mitigated, and Seattle would not have expended millions of dollars of its resources trying to combat the crisis. Thus, as a direct and proximate cause of Defendants' misconduct, Seattle has been injured.

117.    Pursuant to RCW 19.86.090, Seattle seeks a declaratory judgment that Defendants violated the WCPA, an injunction enjoining Defendants' unlawful conduct described in this

- 37 -

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

1  complaint, costs and attorney's fees, actual and treble damages in an amount to be determined at

2  trial, and all other relief available under the Act.

## SECOND CAUSE OF ACTION

### PUBLIC NUISANCE
### RCW CHAPTER 7.48

118.  Seattle incorporates each of the foregoing paragraphs herein as if set forth in their

entirety.

119.  RCW 7.48.120 provides that:

> [n]uisance consists in unlawfully doing an act, or omitting to
> perform a duty, which act or omission either annoys, injures or
> endangers the comfort, repose, health or safety of others, offends
> decency, or unlawfully interferes with, obstructs or tends to
> obstruct, or render dangerous for passage, any lake or navigable
> river, bay, stream, canal or basin, or any public park, square, street
> or highway; or in any way renders other persons insecure in life, or
> in the use of property.

120.  Under Washington law, "a public nuisance is one which affects equally the rights

of the entire community or neighborhood, although the extent of the damage may be unequal."

RCW 7.48.130. Furthermore, an "actionable nuisance" encompasses "whatever is injurious to

health or indecent or offensive to the senses." RCW 7.48.010.

121.  Through the actions described above, Defendants have contributed to and/or

assisted in creating and maintaining a condition that is unreasonable and harmful to the health of

Seattle citizens and/or interferes with the comfortable enjoyment of life in violation of

Washington law.

122.  Rates of opioid abuse and opioid-related overdose have skyrocketed in Seattle.

Locations such as offices of high-prescribing health care practitioners and the pharmacies at

which their patients fill opioid prescriptions attract drug dealers and serve as a source of

diversion. Similarly, abandoned homes and some public spaces have attracted drug traffic,

rendering them and the surrounding private property less safe or, in many cases, entirely unsafe.

Household medicine cabinets have become outlets for diversion and abuse due to over-saturation

of the market, and the foreseeable failure to safely dispose of old opioid prescriptions. The

indiscriminate distribution of opioids has also created an abundance of drugs available for

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

criminal use and fueled a wave of addiction, abuse and injury. It has further resulted in the creation of additional illicit markets in other opiates, particularly heroin and fentanyl, which many users are forced to turn to when they have become dependent on, but are no longer able to obtain or afford, prescription opioids.

123.     Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and abused. Their actions played a central and critical role in allowing rogue pharmacies and health care providers to access and improperly prescribe millions of opioids that were not medically necessary. Indeed, but for Defendants' actions, opioid use could not and would not have become so widespread, and the massive public health crisis that now exists would have been substantially mitigated.

124.     The resulting public nuisance is both substantial and unreasonably burdensome to Seattle agencies, imposing upon them a significantly greater demand for emergency services, law enforcement, addiction treatment, and social services and draining City and local resources. The nuisance has caused and continues to cause devastating harm to communities across Seattle that far outweighs any conceivable offsetting benefit.

125.     Moreover, the public nuisance and its associated financial and non-economic losses were foreseeable to Defendants, who knew or should have known that their careless distribution of millions of opioid pills throughout Seattle and repeated failures to monitor and report opioid diversion would surely create such a nuisance.

126.     Seattle residents have a right to be free from conduct that endangers their health and/or safety, and the wellbeing of individuals in Seattle is a matter of great public interest and legitimate concern to the City. Defendants' actions interfered with the enjoyment of this public right and have injured—and will continue to injure—Seattle residents, including not only the individuals who use, have used or will use opioids, but also the families and communities at large that are subjected to the many harmful indirect effects of rampant opioid use and abuse.

127.     Opioids are abused not only in private homes, but on the streets of Seattle, in public parks, and in municipal buildings. Addicts who have lost stable housing have crowded into encampments on Seattle property, with the byproducts of their abuse, needles, and other

waste, littering Seattle streets. Opioid-caused medical emergencies and related disturbances also occur regularly on, and detract from the intended uses of, Seattle property. Much opioid-related criminal activity takes place on Seattle's streets and rights of way. In these ways, and many more, Seattle's real property interests have been severely impacted by Defendants' conduct.

128.    Defendants' conduct also constitutes a nuisance per se because it independently violates other applicable statutes. As set forth above, Defendants have violated Washington's Consumer Protection Act.

129.    Pursuant to RCW 7.48.020 and 7.48.180, Seattle seeks an order that provides for the abatement of the public nuisance Defendants created, awarding damages equal to the cost of abatement, and enjoining Defendants from future violations of RCW Chapter 7.48.

## THIRD CAUSE OF ACTION

### PUBLIC NUISANCE
### WASHINGTON COMMON LAW

130.    Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

131.    Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Seattle residents and interferes with the comfortable enjoyment of life in violation of Washington law.

132.    The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any potential offsetting benefit.

133.    Defendants knew or should have known that their failure to monitor and report opioid diversion would create a public nuisance.

134.    Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used. Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health crisis that now exists would have been substantially mitigated.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

135.     The health and safety of individuals in Seattle, including those who use opioids as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the City.

136.     Opioids are abused not only in private homes, but on the streets of Seattle, in public parks, and in municipal buildings. Addicts who have lost stable housing have crowded into encampments on Seattle property, with the byproducts of their abuse, needles, and other waste, littering Seattle streets. Opioid-caused medical emergencies and related disturbances also occur regularly on, and detract from the intended uses of, Seattle property. Much opioid-related criminal activity takes place on Seattle's streets and rights of way. In these ways, and many more, Seattle's real property interests have been severely impacted by Defendants' conduct.

137.     Defendants' conduct also constitutes a nuisance per se because it independently violates other applicable statutes. As set forth above, Defendants have violated Washington's Consumer Protection Act.

138.     Seattle seeks an order that provides for the abatement of the public nuisance Defendants have created, enjoins Defendants from creating future nuisances, and awards Seattle damages equal to the cost of abatement.

## FOURTH CAUSE OF ACTION

## NEGLIGENCE

139.     Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

140.     Under Washington law, a cause of action for negligence arises when a defendant owes a duty to a plaintiff and breaches that duty, proximately causing a resulting injury.

141.     Defendants owed a duty of care to the citizens of Seattle, including but not limited to exercise reasonable care in the distribution of highly addictive opioid drugs. Defendants knew or should have known that their decisions to ship large quantities of controlled substances into the City, without taking adequate measures to prevent diversion, created an unreasonable risk of harm.

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

010396-30/1186224 V1

142.     A reasonably prudent distributor would be aware that filling suspicious orders for opioids, without conducting any due diligence or informing the proper authorities, would inevitably lead to over-saturation of the market and increased rates of addiction and its related harms. Given the manifest risk posed by prescription opioids, Defendants have publicly acknowledged their obligation to prevent the diversion of these dangerous drugs.

143.     By distributing massive amounts of opioids without adopting effective controls to prevent their diversion into illegitimate channels, Defendants breached their duty of reasonable care.

144.     Defendants' conduct was a proximate cause of increased opioid use and abuse along with the inevitable and foreseeable resulting consequences and public harms. As a direct and proximate cause of Defendants' unreasonable and negligent conduct, Seattle has suffered and will continue to suffer harm, and is entitled to damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## CIVIL CONSPIRACY

145.     Seattle incorporates each of the foregoing paragraphs herein as if set forth in their entirety.

146.     Under Washington common law, a civil conspiracy occurs when (1) two or more people combine to accomplish an unlawful purpose, or combine to accomplish a lawful purpose by unlawful means, and (2) the conspirators enter into an agreement to accomplish the conspiracy.

147.     As described more fully above, Defendants coordinated their efforts, as part of a shared plan and pursuant to a common agreement, to circumvent their legal obligations to prevent diversion in order increase their profits and revenues selling, distributing, and dispensing opioids in Seattle and across the nation.

148.     To accomplish their unlawful objectives, Defendants systematically failed to report suspicious orders of opioids in order to avoid regulatory scrutiny about those sales. These failures ensured that huge numbers of opioids would flood communities in Seattle and elsewhere.

010396-30/1186224 V1

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

149.     Defendants entered into an agreement to accomplish the conspiracy. But for their agreement, these Defendants, many of whom were direct competitors, would have been incentivized to disclose other Defendants' failures in order to obtain a competitive advantage. Instead, they joined the conspiracy with the expectation that the deceit would not be revealed by their co-conspirators.

150.     But for the conspiracy, Seattle would not have expended millions of dollars to address and abate the public health crisis the conspiracy has foreseeably engendered in Seattle.

151.     As a direct and proximate cause of the conspiracy, Seattle has been injured and seeks an order enjoining further operation of the civil conspiracy, damages in an amount to be determined at trial, and all other relief provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Seattle respectfully prays for the following relief:

A.     A declaration that Defendants' acts described above are unfair acts or practices in trade or commerce, affecting the public interest, and in violation of the Washington Consumer Protection Act, RCW 19.86;

B.     An injunction pursuant to RCW 19.86.090 enjoining Defendants from engaging in any acts that violate the Washington Consumer Protection Act, including, but not limited to, the unfair acts and practices alleged herein;

C.     An award of Seattle's reasonable costs and attorney's fees incurred in this action, pursuant to RCW 19.86.090;

D.     An order requiring Defendants to abate the public nuisance that they created;

E.     An award of damages in an amount determined at trial;

F.     An award of punitive and treble damages as provided by law;

G.     Equitable relief requiring restitution and disgorgement of the revenues wrongfully obtained from the sale of opioids as a result of Defendants' wrongful conduct;

H.     An award of pre-judgment and post-judgment interest, as provided by law; and

I.     Any other further relief the Court deems just and equitable.

010396-30/1186224 V1

**Peter S. Holmes**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200

## JURY DEMAND

Plaintiff, Seattle, by and through its City Attorney, Peter S. Holmes, demands a trial by jury in King County Superior Court on all claims to the maximum number of jurors permitted by law.

DATED this 2nd day of October, 2019. Respectfully submitted,

PETER S. HOLMES
Seattle City Attorney

By: _____
Peter S. Holmes, WSBA # 15787
City Attorney
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Phone: (206) 684-8200
E-mail: Peter.holmes@seattle.gov

OF COUNSEL:

Steve W. Berman, WSBA # 12536
Emilee N. Sisco, WSBA # 50273
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 580-6559
steve@hbsslaw.com
emilees@hbsslaw.com

Anne F. Johnson
HAGENS BERMAN SOBOL SHAPIRO LLP
100 Congress Ave., Suite 2000
Austin, TX 78701
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
annej@hbsslaw.com

Ben M. Harrington
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com

All out-of-state counsel to be admitted *pro hac vice*.

010396-30/1186224 V1

Peter S. Holmes
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200